(33 App. Div. 31.)

DEARING v. McKINNON DASH & HARDWARE CO., Limited, et al.

(Supreme Court, Appellate Division, Fourth Department. July 26, 1898.)

1. ASSIGNMENT FOR CREDITORS—WHAT CONSTITUTES—MORTGAGE.
    An instrument conditioned that the transfer of title to personal property to a trustee, which it was designed to accomplish, was to become absolute only on failure of the maker to pay named creditors within a given time, is a chattel mortgage, and not a common-law assignment, under the laws of Michigan.

2. FRAUDULENT CONVEYANCES—HINDRANCE AND DELAY.
    Where a chattel mortgage given to secure creditors directed that the provision for them should operate only in case they should accept the conditions thereof, and provided that all whose debts were due or should be-

53 N.Y.S.—33

come due within 90 days should assent to an extension of the same for said period, it hindered and delayed such creditors in the collection of their debts.

**3. SAME.**

A chattel mortgage given to secure creditors, which vests the trustee with discretionary power as to the time and manner of converting the property into cash, and gives him liberty to sell on credit, and defer payment of creditors indefinitely, is calculated to delay the creditors in the collection of their claims.

**4. CONTRACTS—VALIDITY—CONFLICT OF LAWS.**

The rule that transfers of personal property, valid by the law of the domicile of the transferror, are sustained by the courts of a foreign state, does not apply where the domiciliary law contravenes the law and policy of such state.

**5. FRAUDULENT CONVEYANCES—PLEADING—STATUTES.**

The right of a defendant to avail himself of the statute of fraudulent conveyances is not lost by failure to raise it by answer or demurrer, where the instrument on which the action is based is incorporated in the complaint, and on its face is repugnant to the statute.

Appeal from trial term, Monroe county.

Replevin by Henry M. Dearing, as trustee for the creditors of the Elms Buggy Company, against the McKinnon Dash & Hardware Company, Limited, Lachlan E. McKinnon, and William N. Notman. From judgment for plaintiff, and an order denying a motion for a new trial, defendants appeal. Reversed.

The Elms Buggy Company is a foreign corporation organized under the laws of the state of Michigan, with its principal office at the city of Albion, in that state. On the 22d day of May, 1896, at a meeting of the officers and stockholders of this corporation, a resolution was adopted authorizing the president and secretary to "make, execute, and acknowledge and deliver to some person to be by them selected as trustee, a chattel mortgage upon all the personal property of the company, and a real-estate mortgage upon its land and plant, all in this city, to secure payment of its indebtedness and indemnity to the First National Bank of Albion, against any guaranties or indorsements, and in the following order, said several creditors having priority also in the same order" (specifying the creditors to be secured). Thereupon, and in pursuance of the foregoing resolution, the president and secretary of the company made, executed, and delivered to the plaintiff an instrument by the terms of which the company granted, bargained, sold, and mortgaged unto the plaintiff, as trustee for certain creditors of the company, all and singular the goods, chattels, personal property, and effects of the company, wherever situated, and of every name and nature. It also authorized the party of the second part, as such trustee, to forthwith take and keep possession of the property thus conveyed, and to "dispose of the same at any time, and in the best manner, and for the best price he can obtain for the same, at wholesale, retail, or in job lots, as in his judgment shall be best for the beneficiaries herein, and to receive payment therefor, and to apply the proceeds in the manner hereinafter provided, after deducting all necessary expenses of taking possession of the same, and of disposing thereof." The mortgage then specified certain parties to whom the company was indebted in various sums, amounting in the aggregate to some $54,000, and stated that it (the company) is also indebted to divers and sundry other persons, firms, corporations, etc., elsewhere, in divers amounts aggregating about the sum of $34,000. It then provided that: "These presents are upon the express condition that if the party of the first part shall and do, ninety days after date hereof, well and truly pay or cause to be paid to the several creditors and classes of creditors before mentioned, in the order above mentioned, the several debts, liabilities, and obligations to them and each member thereof respectively owing, and shall indemnify and save harmless said First National Bank (one of the creditors before mentioned) from all liabilities, losses, and damage on account of any drafts, notes, or

bills discounted by it, or indorsed or guarantied by said first party, and shall also pay, satisfy, and discharge all of its other indebtednesses and liabilities, whether specifically named or not, but intended to be secured hereby, then this instrument to be void; otherwise to remain in full force." The mortgage also contained a covenant "to pay and discharge the said liabilities and obligations ninety days from the date hereof accordingly." It also contained the usual provision authorizing the mortgagee, in the event of default, or in case he deemed "himself or said debts insecure," to take possession of and sell the mortgaged property, and to apply the moneys realized from such sale in the payment of certain debts and obligations in manner following, to wit: "(1) He shall pay all the costs incurred by him in and about the execution of the trust herein created. (2) He shall pay all the taxes, insurance, and other expenses incurred in and about the foreclosure of this mortgage. (3) He shall pay himself a reasonable compensation for his services and executing the trust herein created." With the residue and remainder in his hands such trustee was then directed to pay certain creditors in the order and manner specified, and "(9) out of all the rest, residue, and remainder of the net proceeds and avails of said property, including the proceeds of the mortgage of said real estate, then remaining in his hands, after paying all the debts, liabilities, and expenses before mentioned, the said party of the second part, as such trustee, shall pay all of the other creditors of said first party in full, who accept of this security, and assent thereto, if there be in his hands a sufficient sum for that purpose; and, if not, then he shall pay all such residue and remainder to all other creditors of said first party ratably, share and share alike, in proportion to the amount of their respective claims. It is understood that the proceeds or avails of said real-estate mortgage shall be used and applied in the same order and in the same way as the avails of this mortgage. And said party of the first part promises and agrees to furnish the said party of the second part, as such trustee, a complete list or schedule of the names and post-office addresses of the creditors not hereinbefore mentioned specifically, together with the amount of indebtedness owing by said first party to them respectively, and the same, when complete, shall be taken to be a part of this instrument, so far as designating the persons to whom said residue shall be distributed, and to whose benefit the provisions of this instrument and the avails of said real-estate mortgage shall inure after payment of the expenses and other indebtedness, as before provided. And after the payment in full of all said claims, charges, and expenses, in the manner aforesaid, and in the order aforesaid, said second party, as such trustee, shall deliver the surplus remaining in his hands, if any, to said party of the first part, its successors and assigns." The mortgage also contained these further provisions, viz.: "And it is expressly understood that each and every of the said persons and corporations above mentioned or referred to, and who are intended to be benefited hereby, shall accept and abide by the terms and conditions of this security, and the same shall only operate in favor of those who shall, after knowledge hereof, avail themselves of the security of this instrument, and accept and abide by the terms and conditions hereof, and all whose debts are due or to become due within ninety days shall assent to an extension of the same for said period. And the security of this mortgage shall operate and inure to said several creditors or classes of creditors in the order in which they are mentioned as aforesaid, and shall extend to the liabilities of said first party to them in the order above stated, and on account of the liabilities of said first party to them respectively, as above mentioned. It is believed by the first party that it is for the benefit and advantage of the creditors for it to continue the business of manufacturing until such time as it shall have used up all of its stock now on hand for the purpose of transforming the raw material into manufactured stock, and, in case some certain lines should be exhausted, that it should buy sufficient new material of any kind not on hand necessary to complete the working up of any other available for that purpose. For this reason said first party contemplates the continuance of its said business, and of selling its said product for the benefit of those secured. And it is expressly understood that said first party shall keep a true and accurate and detailed account of all the expenses of so operating the business, and of all receipts, and shall render such account and statement to

said trustee, who shall have the right to examine into the said business and said work; and if at any time he shall believe that the continuance of said business is not for the interest of said creditors secured hereby, he shall have full power and authority to stop the operation of said factory, and take pos session of the said property, if he deems it necessary, and at maturity of this. mortgage dispose of the said property in accordance with the terms of this mortgage. And the said party of the second part, as such trustee, is also authorized and empowered by himself or his agents to receive into his custody all proceeds of sales and all remittances and all orders for manufactured goods at all times; and for that purpose he shall have access to all the correspon1-ence and letter books of said first party to such extent as, in his judgment, is necessary for the full and complete discharge of his duties hereunder." On the day this instrument was executed it was duly filed and docketed as a chattel mortgage in the city clerk's office of the city of Albion, and thereafter, and on the 23d day of May, 1896, a copy thereof was duly filed in the clerk s office of the county of Monroe, in this state, in which county the Elms Buggy Company at that time had some 16 buggies and other property, of the value of from $500 to $1,000. On the 27th day of June, 1896, the defendant, the McKinnon Dash & Hardware Company, a domestic corporation doing busi-ness in the city of Buffalo, in this state, commenced an action against the Elms Buggy Company upon a promissory note, and thereupon caused the property of that company within this state to be attached, and thereafter the same was sold upon execution by the sheriff of Monroe county. The plaintiff accepted the trust conferred upon him by the chattel mortgage, which acceptance bears even date with the mortgage; but the business, with the exception of a small amount of material purchased by the plaintiff, was thereafter conducted by and in the name of the company itself, down to February 25, 1897, when a receiver was appointed in an action brought to foreclose the mortgage upon the company's real estate, since which time the business has been conducted by the receiver "subject to the plaintiff's rights." After the sheriff of Monroe county had taken possession of the personal prop-erty under the attachment issued to him, a demand of its return was duly made by the plaintiff, which demand was refused; whereupon this action was brought.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Charles M. Williams, for appellants.
Horace L. Bennett, for respondent.

ADAMS, J. At the close of the proofs the learned trial court held as matter of law that the plaintiff was entitled to the possession of the property in question, and submitted nothing to the jury save the question of value. This disposition of the case was ap-parently based upon the theory that the instrument relied upon by the plaintiff to sustain his claim of title was a chattel mortgage; that the same was valid under the law of the state of Michigan, and that it consequently operated as a valid transfer of the mort-gagor's personal property, wherever situated. In reviewing the several questions which are necessarily involved in the disposition made of the case by the trial court, it becomes important to de-termine at the outset the nature and effect of this instrument as construed by the law of the state where it was executed; for it seems to be conceded by the plaintiff that, if it is to be treated as a common-law assignment for the benefit of creditors, it is void for the reason, if for no other, that it creates preferences among the creditors of the Elms Buggy Company, and consequently contra-venes the statute of frauds of the state of Michigan, which declares

that "all assignments, commonly called common law assignments
for the benefit of creditors, shall be void unless the same shall be
without preferences as between such creditors and shall be of all
the property of the assignor, not exempt from execution." How.
Ann. St. § 8739. The courts of the state of Michigan have had
occasion to give construction to instruments similar in character
to the one under consideration, and in doing so to point out cer-
tain characteristics by which an assignment may be distinguished
from a chattel mortgage. Without stopping to consider these va-
rious distinguishing features, it may be said that the one essen-
tial difference between a chattel mortgage and a common-law as-
signment is that the former is a conditional, while the latter is
an absolute, transfer of the title to the property affected thereby.
Pettibone v. Byrne, 97 Mich. 85, 56 N. W. 236; Warner v. Little-
field, 89 Mich. 329, 50 N. W. 721. When, therefore, this simple test
is applied to the instrument under which the plaintiff claims the
right to maintain this action, it is quite clear that his contention
rests upon a substantial foundation, for the mortgage contains an
express condition that the transfer of title which it was designed
to accomplish was to become absolute only in the event of the
failure of the mortgagor to pay, within 90 days from its date, the
several creditors and classes of creditors therein mentioned.

Several other objections to the validity of this instrument are
raised by the defendant, but, without noticing the same in de-
tail, we think, in view of the conclusion we have reached upon
another branch of the case, it is sufficient to say that it may be
assumed that under the decisions of the supreme court of Mich-
igan the instrument in question is a ·chattel mortgage, and that,
inasmuch as its execution was authorized by the directors of the
Elms Buggy Company, and it does not entitle the mortgagor to
any of the surplus moneys until all the creditors have been paid
in full, it does not violate the statute of that state inhibiting pref-
erences in common-law assignments. Kendall v. Bishop, 76 Mich.
634, 43 N. W. 645; Cluett v. Rosenthal, 100 Mich. 193, 58 N. W.
1009; Austin v. Bank, 100 Mich. 613, 59 N. W. 597; Adams v.
Niemann, 46 Mich. 135, 8 N. W. 719. The question, however, with
which we are more immediately concerned is this: Does this mort-
gage contravene any statute of this state? the contention of the
defendants being that in several of its provisions it is repugnant
to the policy of this state as declared in what is known as the
"Statute of Frauds," and that consequently it is not valid as against
creditors who have acquired any rights as to property within this
state. This contention, we are inclined to think, is well founded;
for the instrument in question, by whatsoever name it may be
called, does apparently contravene the provisions of our statutory
law, which are designed to prevent a failing or dishonest debtor
from hindering or delaying his creditors in the collection of their
debts. 2 Rev. St. c. 7, tit. 3, § 1. In the first place, the instru-
ment, so far as it affects the creditors who are specifically men-
tioned therein, is coercive, in that it expressly directs that the
provision for such creditors shall operate only in the event that

they shall, "after knowledge hereof, avail themselves of the security of this instrument, and accept and abide by the conditions hereof; and all whose debts are due or to become due within ninety days shall assent to an extension of the same for said period." This, it seems to us, is equivalent to saying to these creditors that if they will extend their debtor's term of credit to a time fixed by the debtor himself, they can share in whatever benefits are to be derived from the instrument, but otherwise they must take whatever the debtor sees fit to allow them. The effect of such a provision must necessarily be to hinder and delay these creditors in the collection of their debts. Hyslop v. Clarke, 14 Johns. 458; Grover v. Wakeman, 11 Wend. 187; Armstrong v. Byrne, 1 Edw. Ch. 79. Again, by the terms of this instrument the trustee named therein was authorized to dispose of the property transferred to him "at any time, in the best manner, and for the best prices he can obtain for the same, at wholesale, retail, or in job lots, as, in his judgment, shall be best for the beneficiaries herein, and to receive payment therefor, and to apply the proceeds in the manner hereinafter provided," etc. This clearly vests the trustee with discretionary power as to the time and manner of converting the property transferred to him into cash, and in the carrying out of this provision he is hampered by no limitation as to time. He is simply called upon to exercise his own judgment, and in doing this he would obviously be at liberty, if he saw fit, to sell upon credit, and thus defer the settlement of the trust and the payment of creditors indefinitely. Such a delegation of power is in direct violation of the spirit, if not the letter, of the statute, because it is well calculated to cause the very delay which the statute inhibits. In the case of Jessup v. Hulse, 21 N. Y. 168, which involved a consideration of this same question, it was said:

"If the clause in question purported in terms to invest the assignee with any discretion, as coming directly from the assignor himself, it would be fatal to the assignment; as if it had authorized the assignee at such time and in such manner as, in his judgment, would be most conducive to the interests of the creditors, or as he should deem expedient and best calculated to promote their interests."

And in the case of Bank v. Westbury, 16 Hun, 458, it was held that where, by the terms of a chattel mortgage, the mortgagor was permitted to remain in possession of the mortgaged property, and in his discretion to sell the same on credit, and thereby keep his other creditors at bay, the transaction was fraudulent per se. But the provisions of this instrument to which attention has thus far been directed are by no means the only ones which have a tendency to hinder and delay creditors, for the mortgagor or assignor expressly reserves to itself the right to continue the business, and not only to convert the raw material which was on hand into manufactured stock, but also to purchase new material for that purpose, and to sell the same for the benefit of the parties secured. This, it seems to us, when considered in connection with the other portions of the instrument, is nothing more or less than a device by means of which the corporation sought to carry on its business, and at the same time secure to itself immunity from im-

portunate creditors; and, if so, it is obviously repugnant to the statute of frauds.

Assuming, then, that the instrument in question is in conflict with the laws of this state, we are brought to the consideration of another, and perhaps a still more important, question, which is whether this fact permits us to treat it as void in view of the further fact that it appears to be valid under the laws of the state where it was executed. It is not to be denied that by a rule of interstate comity transfers of personal property valid by the law of the domicile of the transferror are, generally speaking, upheld and sustained by our courts. Ockerman v. Cross, 54 N. Y. 29; Barth v. Backus, 140 N. Y. 230, 35 N. E. 425. But this, like every other rule, has its limitations, one of which is that the domiciliary law must not contravene the statute law of this state, nor be repugnant to its policy. Barth v. Backus, supra; Hervey v. Locomotive Works, 93 U. S. 664; Warner v. Jaffray, 96 N. Y. 248; Keller v. Paine, 107 N. Y. 83, 13 N. E. 635. In the case last cited it was said that "the general rule that the voluntary transfer of personal property wheresoever situated is to be governed by the law of the owner's domicile always yields when the law and policy of the state where the property is actually located have provided a different rule of transfer from that of the state where the owner lives." And it has been repeatedly held that this general rule also yields in favor of domestic creditors who have secured a lien upon property within this state by attachment proceedings. Guillander v. Howell, 35 N. Y. 657; Keller v. Paine, supra; Hallgarten v. Oldham, 135 Mass. 1. See, also, Bish. Insolv. Debtors, 295. It thus appearing that the instrument under which the plaintiff claims title is in some of its provisions repugnant to the statute, as well as to the policy, of this state, and that the property to which he asserts his title was within this state at the time that instrument was executed, the only remaining question to be determined is whether the defendants are in a position to avail themselves of these facts as a defense to the action. Although it was for some time a mooted question in this state, it seems now to be pretty well settled that the party seeking to avail himself of the statute of frauds as a defense must plead it, unless it appears upon the face of the complaint that the contract sued upon was within the statute (Porter v. Wormser, 94 N. Y. 450; Hamer v. Sidway, 124 N. Y. 538, 27 N. E. 256; Wells v. Monihan, 129 N. Y. 161, 29 N. E. 232; Crane v. Powell, 139 N. Y. 379, 34 N. E. 911); and this, it is conceded, the defendants have failed to do. Nevertheless we are of the opinion that the defendants have not deprived themselves of the right to assert that the plaintiff cannot maintain his action, for the reason that the instrument upon which he bases the same is violative of the statute of frauds. This instrument, it is to be observed, is incorporated into and made a part of the complaint, and whatever defects it possesses are consequently apparent upon the face of that pleading. It follows, therefore, that if the instrument is for any reason invalid, the complaint is defective, for the reason that it does not state facts sufficient to con-

stitute a cause of action; and this is an objection which may be raised at any stage of the proceedings. Code Civ. Proc. § 499; Coffin v. Reynolds, 37 N. Y. 640. It is true that in the case of Crane v. Powell, supra, it was said that "when the defect in the plaintiff's cause-of action appears on the face of the complaint, the defense must be interposed by demurrer"; but in that case the complaint did not disclose an agreement which was invalid upon its face, and consequently the question now under consideration was not in the case, and the language above quoted must, we think, be regarded as obiter.

It appears that at the close of the plaintiff's evidence in this case the defendants' counsel moved for a dismissal of the complaint upon the ground that no cause of action had been established by his proofs, and among the reasons stated in support of the motion was one to the effect "that the instrument under which the plaintiff claims is void by the laws and policy of the state of New York, as against these defendants." This motion was denied, and when the proofs were all in it was renewed, and again denied. We think that within all the authorities which we have cited this motion raised precisely the same question as would have been presented had the statute been pleaded by way of defense. We are not aware that it has yet been held that where an instrument which constitutes a plaintiff's cause of action is void upon its face, an objection to it must necessarily be taken by answer or demurrer, and we are unwilling to establish any such practice. Carling v. Purcell (City Ct. N. Y.) 19 N. Y. Supp. 183; Lupean v. Brainard, 20 App. Div. 212, 46 N. Y. Supp. 1044. Our conclusion therefore is that the statute of frauds was available to the defendants as a defense in this action, and-that, because the instrument sued upon is clearly repugnant to that statute, the judgment and order appealed from should be reversed.

Judgment and order reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.