LOUIS COHEN, Respondent, v. MORRIS H. ROTHSCHILD and BERNARD E. HYMAN, Appellants.

First Department, March 8, 1918.

Principal and agent — action by customer against firm of cotton exchange brokers to secure return of payments made — counterclaims for balances — evidence not establishing agreement that no contract should be retained until time for delivery or receipt of cotton — fraud — recognition of indebtedness by making payment — " cross sale " — " switches "— impeachment of account stated between customers and brokers — failure of broker to execute order — evidence as to customers' accounts — records of brokers — fiduciary relation between customer and brokers trading on discretionary account — right of customer to repudiate trade not executed according to rules of exchange.

In an action by a customer against a firm of cotton exchange brokers to recover payments made to the defendants upon the ground, *first*, that they were received without consideration and pursuant to a scheme by which the defendants intended to defraud the plaintiff by receiving the

money on a false claim that they had made contracts for him on the cotton exchange when they in fact had made none, or when those they had made had been offset and settled by alleged contracts of a similar nature made in behalf of themselves, or one of them, and *second*, that said payments were made without the defendants having purchased or sold cotton to be received or to be delivered by the plaintiff, or by any one in his behalf, and on a wager or contingency by which both parties intended it to be used as wagers or bets upon the course of quotations in violation of the statute, the defendants interposed counterclaims on an account claimed to have been stated and for balances alleged to be due and unpaid.

*Held*, that a finding by the referee that there was a mutual understanding between the parties that no contract should be retained until the time for the delivery or receipt of the cotton, was against the weight of evidence and should be reversed;

That fraud alleged in the first count not having been sustained by the evidence, said count and the complaint should have been dismissed.

As the first count of the complaint contains no appropriate allegations to impeach or surcharge the accounts as kept and rendered by the defendants, and retained and acquiesced in by the plaintiff, without objection, said accounts are binding upon him.

The plaintiff by making payment to the defendants recognized and admitted that he was indebted to them, and he was not entitled to recover such payment, in the absence of proof that some material fact was fraudulently concealed or that the payment was made on some material false representation.

Where a floor broker, holding an order from different customers to buy and sell on the same terms, cries out the transaction on the exchange and makes the sale, and also purchases at the price shown by the last sale, the transaction is called a " cross sale " and is not in accordance with the rules of the exchange, but where the customer in each instance receives the benefit of the trade in accordance with his order, he is not prejudiced thereby.

Neither seller nor purchaser is bound by a " cross sale " or trade and either or both may repudiate it as not made according to the rules of the exchange.

Ordinarily a customer has no redressible grievance by the irregular execution of his orders unless he has thereby sustained a pecuniary loss.

An entire general account between a customer and his brokers is not impeached by their failure properly to execute certain orders.

The rule that an account stated is ordinarily impeached by impeaching one of the items thereof is not applicable to a general account between a customer and brokers, for in such cases the irregular or unauthorized execution of one or more trades merely entitles the customer to have such trades stricken from the account and does not warrant a recovery by the customer of all moneys paid to the brokers without regard to the trades regularly made.

Where a broker being unable or deeming it inadvisable to execute a specific order for a particular month specified by the customer, executes it for

another month and reports it executed as ordered, the transaction is termed a " switch " trade, the broker assuming the risk of being able later on to effect a sale or purchase for the particular period and at the price desired by the customer.

Where in such a transaction there has been no profit made by the broker, the customer is not prejudiced thereby and has no just ground of complaint.

Where a customer authorized a sale at a specified price, and the brokers reported to him that it had been made at that price, although the floor member had overlooked the order and lost the benefit of the market at the specified price and charged the trade to error account and had his firm assume the same on the basis authorized by the customer, the latter is not entitled to complain, where there was no profit to the brokers.

Where it appears that the entries in a customer's accounts in the permanent record of his brokers have been correctly transcribed from telephone sheets which have been lost, said records are presumptive evidence of what the telephone sheets would have shown.

It appeared that all of the trades charged and credited to a customer's account were made on his specific orders or on orders from a member of the firm of brokers trading for him on discretionary account; that in nearly all instances the customer had verbal notice thereof shortly after they were made, and subsequent formal notice in writing, and that he neither repudiated them nor questioned their genuineness. *Held*, that the evidence produced by the brokers was sufficient to show that all of the trades, except certain cross sales and switches, were made for the customer and according to the rules of the exchange.

Where a firm of brokers through a member thereof is trading for the customer on discretionary account and at the same time is trading on like account for other customers, and also for itself, a relation of the most delicate fiduciary character exists, but it is not unlawful where the customer knows of the material facts.

Where a customer under such circumstances daily received formal notice in writing of all trades made for his account, and also other statements thereof, he is chargeable with knowledge that the member of the firm trading for him was thereby afforded an opportunity to defraud him by taking the trades for himself or his firm or for other customers.

A customer after thus trusting a broker should not, without some proof of dishonesty or bad faith, be allowed to prevail in his contention that his trusted agents cannot recover unless they affirmatively show that they have not cheated him and could not have done so.

Although the rules of the exchange permit brokers to operate on their own account, and on discretionary account for customers provided they do not solicit such authority, they should not undertake while so operating for themselves to operate for customers on discretionary account, and if they do, there should be permanent records made at the time and preserved, identifying and distinguishing such trades from trades made for themselves and for others.

A customer who has authorized a broker to trade for him according to the rules of the exchange, is at liberty to disaffirm any trades not executed according to the rules of the exchange, upon discovering the fact.

APPEAL by the defendants, Morris H. Rothschild and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 26th day of July, 1916, upon the report of a referee appointed to hear and determine the issues.

The judgment among other things dismissed the defendants' counterclaims.

*John R. Abney* [*Osmond K. Fraenkel* with him on the brief], for the appellants.

*Edward D. Brown* of counsel [*Harry P. Rodman* with him on the brief], for the respondent.

LAUGHLIN, J.:

The action is by a customer against a firm of cotton exchange brokers. The recovery was for $7,735, being the amount paid by the plaintiff to the defendants from time to time from the 11th of November, 1911, until the 4th of May, 1912, together with interest from the times of the respective payments. The counterclaims were for balances claimed by the brokers.

The complaint contains two counts. The first is to recover the money on the ground that it was received without consideration and pursuant to a scheme by which the defendants intended to defraud the plaintiff by receiving the money on a false claim that they had made contracts for him on the cotton exchange when they, in fact, had made none, or when those that they had made had been offset and settled by alleged contracts of a similar nature made in behalf of themselves or one of them. The second count is to recover the money on the ground that it was paid without the defendants having purchased or sold cotton to be received or to be delivered by the plaintiff or by any one in his behalf and on a wager or contingency by which both parties intended it to be used as wagers or bets upon the course of quotations upon the price of cotton upon the New York Cotton Exchange in violation of the statutory law of New York. The answer admits the delivery of the money by the plaintiff to the

defendants with the exception that it is alleged that the first $50, which was delivered on the 11th of November, 1911, was delivered to the former firm of Rothschild & Nuzum, of which the defendant Rothschild was a member, which was dissolved on the 1st day of December, 1911, at which time defendants formed a firm and continued the business, and put in issue the other material allegations of the complaint. For a separate *defense* defendants alleged, in effect, that an account was stated between the parties on the 30th of June, 1913, which showed a balance of $7,635 owing to them, which the plaintiff promised and agreed to pay but has failed so to do, and that thereafter defendants executed on the exchange numerous orders in their own names and without disclosing plaintiff's name, for him for the purchase and sale of contracts for the future delivery of cotton and notified him daily with respect to such transactions on which on the 28th of August, 1913, he was indebted to them in the sum of $5,040 for moneys expended for his account and defendants had earned commissions in the sum of $150, aggregating $5,190, on account of which he had paid only $1,945, leaving a balance of $3,245 due and owing to the defendants which he promised and agreed to pay but failed so to do. The first counterclaim is on the account alleged to have been stated for $7,635; the second is on the balance alleged to be due and owing on the subsequent transactions, and a third embraces the amounts claimed in the other two but it is to recover the balance claimed to be due to the defendants on the general account between the parties for the entire period.

The plaintiff was a retired fur dealer. He had traded in stocks on the New York Stock Exchange through brokers on margin account and before opening this account he had made one purchase and sale of cotton contracts through another firm of brokers. He testified that at the instance of an acquaintance, one Sullivan, who was an employee of the former firm of Rothschild & Nuzum, he commenced trading in cotton contracts through that firm.

A purchase and sale of the same quantity or a sale and purchase of the same quantity are referred to as a *transaction* on the theory that they constitute a complete transaction, and a sale or purchase is referred to as a *trade*.

The first transaction was the sale of 100 bales of cotton on the 23d of October, 1911, and the purchase of a like amount the next day at a profit of $75. The second transaction was the sale of 100 bales on the twenty-fifth of October, and the purchase of 100 bales on the thirty-first on which there was a profit of $85. The third transaction was the sale of 100 bales on the first of November and a like amount on November second and ninth, and the purchase of 300 bales on the tenth of November at a loss of $210. This left the plaintiff indebted to the firm in the sum of $50 which he paid the next day. The plaintiff continued to speculate in cotton futures through the defendants and on the 1st of May, 1912, his account showed a loss of $8,330. He made a payment of $3,000 on the fourth of May, reducing the loss to $5,330. That was the last payment he made, and all payments made by him aggregated $7,735, which together with interest is the amount of the recovery.

According to the testimony first given by the plaintiff and several times repeated all of the trades down to that time were made by the defendants on specific, definite orders given by him involving no discretion on their part. But after so testifying, he testified that the defendant Rothschild commenced trading for him on discretionary orders or account, which he explained to mean that Rothschild was authorized to and did buy and sell for him without specific orders or any orders, about April 1, 1912. Rothschild admitted that he commenced trading for the plaintiff without specific orders and in his discretion in April and May, 1912. There is evidence to the effect that during the time that Rothschild thus traded for the plaintiff on discretionary orders or account the plaintiff was also trading on his own account and there is no evidence identifying any particular trade as having been made by Rothschild for the plaintiff prior to the last payment. All payments made by the plaintiff were after the trades or transactions were had showing him to be indebted to the defendants and no payment exceeded the balance shown by the accounts owing to the firm at the time it was made. The plaintiff at no time put up any margin with the defendants.

No fraud was shown nor found.

The theory on which the plaintiff claims a violation of the statute is that, according to his testimony, he did not intend actually to deliver or to receive cotton. He, however, testified that he intended to purchase and to sell contracts for the future delivery of cotton in accordance with the rules of the exchange and he understood that those rules required, as they do, an actual delivery or receipt of the cotton by the owner of the contracts for the sale or receipt at the time at which delivery or receipt was required under the rules of the exchange. In other words, he understood that it would be incumbent upon him to deliver or receive cotton if he retained the contracts at the time for the delivery or receipt thereof. The learned referee found on conflicting evidence that there was a mutual understanding between the parties that no contract should be retained until the time for the delivery or receipt of the cotton. The plaintiff testified that it was so understood between him and Rothschild, but the latter denied it. The credibility of the plaintiff is to an extent impeached by the fact that it is evident that this action was instigated by parties unfriendly to the defendants whose object was to injure them in their business as brokers. It is improbable, I think, that the defendants, who so far as appears are reputable brokers, would have made such an agreement. They and the plaintiff knew that a vendor or purchaser of contracts for the future delivery of cotton might legitimately dispose of his contracts before the time for the receipt or delivery of the cotton arrived, and doubtless they knew that he so intended, but there was no necessity for an agreement to that effect. The theory that the understanding was had at the instance of the defendants is not probable, for, while they may have deemed that course to be for the interest of the customer, owing to the fact that the contracts call for no particular grade of cotton and there are more grades some years than others, it would have been to their interests financially to have their customers receive or deliver the cotton for they would then have received additional commissions. If the effect of the finding be that the customer and brokers entered into an agreement to that effect at the outset the validity of the trades or transactions pursuant thereto, as between them, but of course not as between the vendors and

vendees, might, in view of some of the decisions in this juris-
diction, be open to serious question. (See *Zeller* v. *Leiter*, 189
N. Y. 361; *Weld* v. *Postal Telegraph-Cable Co.*, 199 id. 88;
*Yerkes* v. *Salomon*, 11 Hun, 471; *Botts* v. *Mercantile Bank*, 170
App. Div. 879.) Inasmuch, therefore, as we regard the finding
on that point as against the weight of evidence it should be
reversed. The validity of trades and transactions in contracts
for the future delivery of cotton according to the rules of the
New York Cotton Exchange was quite recently fully examined
and sustained by this court and the Court of Appeals. (*Springs*
v. *James*, 137 App. Div. 110; affd., 202 N. Y. 603. See,
also, *Smith* v. *Craig*, 211 id. 456.) On the authority of *Springs*
v. *James* (*supra*) the second count of the complaint herein
was dismissed by the referee.

The fraud alleged in the first count not having been sustained
by the evidence, that count and the complaint should have
been dismissed also. The plaintiff for a large part of the
time during the business hours of the exchange was in the
office of the defendants and received prompt reports of the
execution of the orders given by him as distinguished from
trades made for him by Rothschild on discretionary account,
and in addition to this he received daily reports in writing by
mail with respect to *all* trades for him and the prices, and also
other statements of purchases and sales and commissions
charged and monthly ledger statements of the items of the
account showing balances. It is immaterial, I think, whether
any of the trades made before the last payment were made for
the plaintiff by Rothschild without a specific order, for it is
undisputed that before making such payment, he knew and
had notice of the orders the defendant claimed to have executed
on his behalf and so far as appears he made no objection
thereto. The first count contains no appropriate allegations
to impeach or surcharge the accounts as kept and rendered by
defendants and retained and acquiesced in by plaintiff without
objection and which in the absence of such allegations became
binding upon the plaintiff (*Stiebel* v. *Haigney, No. 1*, 134
App. Div. 516. See, also, *Pemberton* v. *McAdoo*, 149 id. 20;
*Stoughton* v. *Lynch*, 2 Johns. Ch. 209), or to authorize a
recovery on any other theory. Aside from the fact that the
cause of action is predicated on fraud, the plaintiff, in the

circumstances, could neither have made the last payment at the request of the defendants nor without such request and then have come into court and required the defendants to account with respect thereto, for by making the payment he recognized and admitted that he was indebted to them to that extent (See *Sprague* v. *Currie*, 133 App. Div. 18), but of course a recovery might be had if it were shown that some material fact was fraudulently concealed or that the payment was made on some material false representation. There is, however, no evidence to that effect.

The theory on which the learned referee allowed the plaintiff to recover the amount thus paid is that the manner in which the defendants executed five orders was not in accordance with the rules of the exchange, and that, therefore, the entire account was impeached, and all of the trades and transactions became presumptively unlawful.

Two of the five were orders for the purchase of contracts for the future delivery of cotton, one on the 9th and the other on the 26th of April, 1912. Those orders were executed by crossing them with orders received by the floor member of the defendants from other customers at the same time to purchase like contracts on the same terms, which was in accord with the custom followed by brokers on the cotton exchange, but was found by the referee not to have been authorized by the rules of the exchange. We agree with the referee with respect to that finding, for crossing the orders involved resorting to the making of fictitious records in an effort to conform to the rules of the exchange which required that there should be two brokers to every purchase or sale, one on either side of the trade, and the signing of sales and purchasing slips by them respectively. The floor broker holding the order from different customers to buy and sell on the same terms would cry out the transaction across the ring on the exchange and make the sale and purchase himself at the price shown by the last sale on the exchange. That is called a cross sale or trade. The reason for this custom was to insure the execution of the orders and to give both customers the benefit of the price at which they respectively were willing to sell and buy, for it appears that if the broker offered to execute them separately and to sell at the market the sale might be made at a lower

price than the last preceding sale and that if he offered to buy at the market the purchase price might be higher than the last sale. Although those trades were not executed in strict accord with the rules of the exchange, the customer was not prejudiced thereby, for in each instance he received the benefit of the trade in accordance with his order. Doubtless neither seller nor purchaser would have been bound by the trade and either or both might have repudiated it as not made according to the rules of the exchange. Each customer, however, realized what he would have realized if the sales had been made to or purchases made from another broker on the floor of the exchange; and the only benefit the defendants derived was their commissions from each customer which they would have received had the trades been executed according to the rules of the exchange. Those purchases and sales were actually consummated as real transactions precisely as if made according to the rules of the exchange with the exception that a friendly broker who had no part in the trade was induced in each instance to sign a purchase or sales slip to make a record in an endeavor to conform to the rule requiring two brokers to each trade, and, therefore, they were not merely bookkeeping entries as in *Haight* v. *Haight & Freese Co.* (112 App. Div. 475). Ordinarily a customer has no redressible grievance by the irregular execution of his orders unless he has thereby sustained a pecuniary loss. (*Porter* v. *Wormser*, 94 N. Y. 431, 446; 1 C. J. 373; *Taylor* v. *Guest*, 58 N. Y. 262.) This evidence, viewed in the most favorable light to the plaintiff, only gave him the right, on discovering the facts, to disaffirm. Assuming that he is to be deemed to have disaffirmed these particular trades, the learned referee fell into error in applying to the general account between the customer and the brokers the rule applicable to an account stated, and in holding that the entire general account was impeached by the failure of the defendants properly to execute those five orders. An account stated ordinarily is impeached by impeaching one of the items thereof (*Stiebel* v. *Lissberger*, 166 App. Div. 164); but that rule is not applicable to a general account between a customer and brokers, for in such cases the irregular or unauthorized execution of one or more trades merely

entitles the customer to have such trades stricken from the account and does not warrant a recovery by the customer of all moneys paid to the brokers without regard to the trades regularly made. (*Bischoffsheim* v. *Baltzer*, 20 Fed. Rep. 890; Dos Passos Stockb. 373. See, also, *Levy* v. *Loeb*, 89 N. Y. 386.)

Two of the other trades which the referee found to have been illegally executed were the purchase of 100 bales of October cotton on the 1st day of May and the sale of 100 bales of July cotton on the 4th of May, 1912. These were also specific, definite orders and they were executed by trades known as switches which are resorted to when the broker cannot execute the order as given or cannot in his judgment execute it advantageously to the customer but is willing to give the customer the benefit of the order as if executed as directed or most advantageously to him. The broker being unable or deeming it inadvisable to execute the order for the particular month specified by the customer executes it for another month and reports it executed as ordered. In such instances the broker assumes the risk of being able later on to effect a sale or purchase of cotton, as the case may be, for the particular period and at the price desired by the customer or which he would ordinarily receive in a normal market and of thus switching the trade. Those transactions likewise were customarily indulged in on the exchange but were not provided for by the rules. With respect to a switch the customer gets the benefit of a purchase or sale in accordance with his order and the brokerage firm assumes the risk of its inability to obtain as favorable terms by switching; and if it fails so to do the brokers stand the loss and the customer suffers no damage. A brokerage firm may, in such a transaction, be able to make the purchase or sale later more favorably and if so, having taken the risk, it appropriates the profits. In *Springs* v. *James* (*supra*) this court had under review an item involving a switch and it was sustained, but the customer was given the benefit of the profit there made by the broker. In the case at bar there was no profit made by the brokers and, therefore, under the rule already stated the customer was not prejudiced and has no just ground of complaint.

The other item which the referee held was illegally executed was a sale of 100 bales of cotton on the 30th of April, 1912. The customer authorized the sale at a specified price and the brokers reported to him that it had been made at that price, whereas the floor member overlooked the order and lost the benefit of the market at the specified price, and charged the trade to error account and had his firm assume the trade on the basis authorized by the customer. On principle that is somewhat analogous to the switch trades. Doubtless if the brokers profited by being able to sell the cotton at a higher price the plaintiff would be entitled to the profit, but it does not appear that there was any profit. In that instance the brokers thus voluntarily did what the courts would have compelled them to do, namely, answered to their customer, giving him the benefit of the market price at which he authorized the sale, and took upon themselves the loss which, without litigation, they conceded to have been the result of their failure to execute the customer's order. Doubtless the plaintiff could have disaffirmed four of these five items (See *Taussig* v. *Hart,* 49 N. Y. 301; 58 id. 425; *Bischoffsheim* v. *Baltzer, supra; Brookman* v. *Rothschild,* 3 Sim. 153; affd., 5 Bligh, 165; 1 Dos Passos Stockb. 373–376), one of which was a switch trade with Rothschild personally although that was unknown to the floor member who executed the orders, but he has not proceeded on that theory and has not shown that the balance owing to the brokers on trades and transactions authorized by him and regularly executed was less than the amount which he paid. After finding that the action of the brokers with respect to these five items was irregular and illegal and not binding on the plaintiff the referee found that the plaintiff had failed to show that any other trade was not made in accordance with the rules of the exchange and his directions and authority conferred by him. If he could have disaffirmed these five trades and had done so that would not authorize a recovery of the entire amount paid and no right to recover is claimed on any other basis than plaintiff's right to repudiate all the transactions and trades and to recover the entire amount paid by the brokers. There evidently was no claim made by the plaintiff on the trial and has been none on the appeal that the account could be modified by eliminating

these five trades or any of them and that this would show it closed with a balance in his favor. It is quite clear, therefore, we think, that even on the erroneous theory adopted by the referee in thus departing from the complaint the plaintiff was not entitled to recover and his complaint should have been dismissed.

The remaining questions arise on the dismissal of the counterclaims. On the issues arising on the counterclaims and reply thereto the burden of proof was on the defendants. In addition to the cross sales and switches to which reference has been made, the referee found that there were numerous other similar cross sales and switches represented in the account covering the subsequent period, and he dismissed the counterclaims on the ground that in so far as the counterclaims were based on accounts stated the accounts stated were impeached by these illegal and unauthorized trades and that with respect to the counterclaim on the general account it was not satisfactorily shown by the defendants that the trades charged and credited to the plaintiff's account therein were made and settled for his account. The learned referee in his opinion clearly and accurately describes the general method by which defendants transacted business and by which business was customarily transacted on the exchange as follows: " When an order is given in the office of a cotton broker, the practice is to record it upon so-called telephone sheets and transmit it to the floor of the Exchange over the telephone, where it is received by the broker's telephone clerk, who writes it upon a slip and sends it by a page to the floor broker for execution. The name of the customer is not transmitted with the order and is generally not known to the telephone clerk or the floor broker by whom it is executed. The floor broker cries the order across the ring, stating his bid or his offer to sell, as the case may be, and when accepted by another floor broker, the trade is executed. He then records the trade upon his ' broker's card,' which he has in his possession and retains, records it also on the slip and sends the slip back to the telephone clerk, who advises his office over the telephone that the trade is made. Its execution is recorded opposite the order on the telephone sheets, and is posted from these sheets into the books. So-called confirmation slips setting

forth the transaction as having been made ' subject in all respects to the rules and regulations of the N. Y. Cotton Exchange ' are also made up from these sheets and sent to the customer. The floor broker representing the seller reports the sale to the official reporter and it is then recorded. After the close of business at three o'clock the members who have made trades, or their duly authorized ' sign-up clerks,' meet for the purpose of signing and exchanging contract slips, which have been made up from the slips received from the floor broker, afterwards checked with the broker's cards, and which amount to bought and sold notes in terms ' subject to the By-laws and Rules of New York Cotton Exchange.' The parties, who are both members of the Exchange, have then made and each side has secured written evidence of a binding contract for the purchase and sale of actual cotton, and the contracts so made and evidenced are those that may be settled under the rules. These settlements are wholly between the parties to the contract, that is, between the members of the Exchange. The customers are not concerned therewith and they do not appear upon the customer's ledger. The results are set forth on Clearing House sheets, and when the difference in prices disclosed thereon is adjusted through the Clearing House, the cotton involved in the contracts that are settled between the brokers is paid for." It appears that the telephone sheets covering part of the period in question had been destroyed as it was not customary to preserve them as part of the permanent records more than six months, and the entries therein were copied daily into the purchase and sales book and checked up and the trades were then posted in the customers' contract ledger, and that was done with respect to the trades made for the plaintiff. The telephone sheets constituted the only record showing for whom the trades were made, but the evidence shows that the entries in the customers' accounts in the permanent record were correctly transcribed from the telephone sheets and, therefore, presumptively they show what the telephone sheets would have shown. The defendants kept a street book in which the trades between the different brokers were entered from the contract slips signed by the brokers in accordance with the rules of the exchange, but that book does not show

the names of the customers and is in effect an account between the brokers. Defendants also kept a street settlement book in which direct and ring settlements authorized by the rules of the exchange were entered, but it does not show the customers for whom the brokers traded. Daily clearing house sheets showing the balances due to the defendants from other brokers or owing from them to other brokers as a result of the settlements made in accordance with the rules of the exchange and adjusted through the clearing house were also kept by defendants. Defendants also kept an account sales book and a general ledger and in the latter were entered from the account sales book and clearing house settlements the total amount received and paid on account of all closed transactions and the amount received and paid through the clearing house. The individual accounts of the respective customers showed the amounts received and paid out for the particular customer and his profits and losses. The defendants' books showed that all trades charged to the plaintiff's account had been settled and that the monthly delivery accounts had all been closed and that the financial settlements through the clearing house had all been made and these balanced with the customers' individual accounts, and the defendant Rothschild testified that defendants had settled with all other brokers and with all customers. The learned counsel for defendants contended on the trial that this was the only practical way of showing that the items charged in the plaintiff's account had been paid by the defendants. The learned referee was of opinion that if it satisfactorily appeared that all of the trades charged to a customer's account were lawful contracts and had been actually made for him and were included in those settled and paid for between the brokers, this evidence would constitute *prima facie* proof of all payments so recorded inasmuch as the month of delivery accounts when actually closed would not balance with the customer's accounts unless those accounts were correct, but he was of opinion that in the instant case this method failed inasmuch as the cross and switch trades were not executed according to the rules of the exchange. He was of opinion, therefore, that it was incumbent on the defendants to prove he payments involved in each transaction by other evidence

than the entries in their books and that on that point they failed. They proved the original slips signed by other brokers corresponding with all trades charged to the plaintiff; but those slips did not show the name of the customer and the rules of the exchange did not require it and it is to be inferred that it was not the custom to have the name of the customer for whom the trade was made shown thereon. They were the slips received by the defendants from the brokers representing the other side of the respective trades who naturally did not know for whom the defendants made the trade. The floor broker, representing the defendants, who received these slips not knowing for what customer the trade was made, was not in a position to indicate thereon the name of the customer. Doubtless this might have been done subsequently by the defendants, but it does not appear to have been the custom. The referee was of the opinion that in these circumstances the slips constituted no evidence that a trade with which they corresponded was made for a particular customer without the production and proof of slips for all corresponding trades made for the defendants themselves or other customers and that without such proof the slips produced and proved as representing the trades made for the plaintiff would answer as well to prove that the trades were made for themselves or for other customers. In other words, he was of opinion that it was incumbent on defendants to produce and prove sufficient slips " to go around." This defendants claim they could have done but that it would have taken months to do it. In view of the fact that all of the trades charged and credited to the plaintiff's account were made on his specific orders or on orders from Rothschild, trading for him on discretionary account, and that in nearly all instances the plaintiff had verbal notice thereof shortly after they were made and formal notice in writing daily of all trades made for his account and monthly and other accounts in writing as well and that he neither repudiated them nor questioned their genuineness, I am of opinion that the evidence adduced by the defendants should be deemed sufficient to show that all the trades, excepting the cross sales and switches, thus reported to him and for which corresponding slips signed by the broker on the opposite side of the trade were proved, were made for him and according

to the rules of the exchange. There of course existed between the plaintiff and defendants, particularly in view of the fact that through Rothschild the defendants were trading for the plaintiff on discretionary account and at the same time were trading on like account for other customers and were also trading for themselves, a relation of the most delicate fiduciary character and one which no agent should have undertaken and which no principal should have intrusted to an agent, but plaintiff knew all the material facts and it was not unlawful. (See *Hopkins* v. *Clark,* 158 N. Y. 304; Dos Passos, *supra,* 355–357, 373–376, 383, 384.) The evidence shows that at one time Rothschild was thus trading on discretionary account for fifty customers, and it is to be inferred that the orders given by him for them were not entered on the telephone sheets but were given by him at the exchange to the floor member for execution and no record was made at the time he gave the orders and preserved with respect to the particular customers for whose account the trades were made. He would be at the exchange at the opening and then or shortly thereafter would give the orders and the floor broker would report to him the execution thereof, and it is to be inferred that on returning to the office soon thereafter he would give a memorandum to his employees charged with keeping the books with respect to the trades so ordered by him and for whose account and that they were entered up accordingly. With respect to such trades for the plaintiff Rothschild testified that at the plaintiff's request he always notified the telephone operator at the exchange after a trade was made and that notice of such trade was telephoned to the office of defendants where the plaintiff usually was; and in this he is corroborated by other testimony which also tends to show that the plaintiff was thus promptly notified of the discretionary trades made for his account. The plaintiff denied that he had requested Rothschild to give him prompt verbal notice of such trades or that he received them in *all* instances. Rothschild testified that no such verbal notices were given to any other customer for whom he traded on discretionary account, but there is testimony that like notices were given to some of the other customers. Rothschild also conceded that the plaintiff was not always at the office during the business hours of the

exchange. The referee, therefore, did not deem that the evidence satisfactorily showed that the plaintiff received such verbal notices in *all* instances; but the uncontroverted evidence shows and he conceded that he daily received formal notices in writing of *all* trades made for his account and monthly and other statements as well. The evidence shows and the referee found that the plaintiff knew that Rothschild was trading for himself and the defendants and for other customers on like discretionary account. I think, therefore, that he was chargeable with knowledge that Rothschild was thereby afforded an opportunity to defraud him by taking the trades for himself or his firm or for other customers if the course of the market immediately thereafter indicated that they were favorable and if not by giving them to him. He, however, imposed no condition or restriction by which he could be assured that the orders for the trades charged to him were originally intended for him. There is no charge or evidence that Rothschild did thus abuse the trust reposed in him; and yet it is argued in effect that it is to be presumed that defendants abused this trust and that they must conclusively show the honesty of the trades they claim to have made for plaintiff. The plaintiff apparently had full confidence in Rothschild and so far as appears never made a suggestion indicating a suspicion with respect to the correctness of the accounts and the trades reported and rendered to him. He kept a personal memorandum most of the time with respect to the trades made for him, but he made no memorandum or notation on the accounts received from the defendants to show which were trades by his own order and which were on the order of Rothschild, although he must have known and have been able at the time so to distinguish them. Neither Rothschild nor defendants kept any record distinguishing the trades ordered by plaintiff from those ordered for him by Rothschild, nor did plaintiff request them so to do. The plaintiff, I think, after thus trusting Rothschild, should not without some proof of dishonesty or bad faith prevail in his contention that his trusted agents cannot recover unless they affirmatively show that they have not cheated him and could not have done so. We agree with the learned referee that although the rules of the exchange permit brokers to operate on their

own account and on discretionary account for customers, provided they do not solicit such authority, they should not undertake, while so operating for themselves, to operate for customers on discretionary account, and if they do there should be permanent records made at the time and preserved identifying and distinguishing such trades from trades made for themselves and for others.   As already observed, however, there is no evidence of dishonesty or bad faith on the part of Rothschild nor is there any evidence that the orders he ordered executed for himself or his firm or for other customers were inconsistent with the orders given in behalf of the plaintiff or that he or his firm obtained any benefit or advantage, other than the customary commissions, from the execution of the orders charged to the plaintiff.   If the plaintiff was dissatisfied with any trade made for his account he should have objected at the time and he should not now be heard to complain of any of the trades executed according to the rules of the exchange.   The only objection shown to have been made by him notwithstanding the receipt and retention not only of the daily reports of trades but of the monthly and other accounts is that at times he complained that Rothschild closed out a particular trade on a margin of profit to him only about equal to the commissions charged by the brokers and that in other instances he deemed a particular trade unwise and promptly closed it out by ordering the defendants to make a purchase or sale against it.   It is fairly to be inferred that his losses were largely due to such action on his part, and to trades personally ordered by him.   The plaintiff, however, is not to be foreclosed from repudiating any trade not executed according to the rules of the exchange on discovering the fact.   He was not aware until long after that any of them were not so executed, and evidently the information was imparted by those who instigated the litigation.   Counsel for the appellants is in error in contending that in *Springs* v. *James* (*supra*) switches were sustained as regular and authorized by the rules of the exchange.   It there appeared that the customer had sold cotton short, and on a particular day he directed the broker to purchase sufficient cotton to close out his short contracts. In so doing they procured more favorable terms for him by resorting to a switch as to part, and reported the purchases as

all made as directed. They, however, subsequently made a profit of seventy-five dollars on the switch, and the court awarded it to the customer. If the switch had been held to have been *authorized* by the exchange, the customer would not have been entitled to those profits; but since he had directed the purchase according to the rules of the exchange, which if followed would have resulted less favorably to him, it was a case of the irregular execution of an order, and the customer was given the profit which the brokers made thereon. But in the instant case the trades made by plaintiff's direction and those made for him by Rothschild without any specific direction are not identified, and, therefore, we think they should all be deemed to have been made by direction of Rothschild and without any specific direction from plaintiff. He only authorized Rothschild to trade for him according to the rules of the exchange, and, therefore, was at liberty to disaffirm all cross trades and switches on discovering, as he did on the trial, that they were not made according to the rules of the exchange. The only trades shown not to have been made according to the rules of the exchange, and which the plaintiff was thus at liberty to repudiate, are the cross trades and switches. The evidence showed, and the referee found, as already observed, that in the general account covering the entire period there were quite a number of cross trades and switches, but it is manifest that if the account were modified by eliminating them therefrom it would still show a large balance owing to the defendants. No witness was called to aid in the determination of this question by stating the effect of striking these items from the account or whether that would leave the account closed; but counsel for the appellants in his brief has taken up these items and has made a calculation with respect thereto, showing that if they were all eliminated from the account they would merely reduce the balance claimed to be owing to the defendants by the sum of $925. We have not had the benefit of any argument or suggestion by counsel for respondent with respect to such calculation. We shall, therefore, assume that it is correct, and if there be any error therein it may be corrected on the settlement of the order.

It follows, therefore, that the findings and conclusions

of law inconsistent with these views should be reversed and appropriate findings and conclusions of law in accordance therewith should be made and incorporated in the order to be entered on the decision of the appeal, which should be settled on notice, and should specify the findings and conclusions reversed, and that the judgment should be reversed, with costs, and the complaint dismissed, and that the defendants should have judgment on their counterclaim for the balance owing on the general account after modifying the same by eliminating the cross and switch trades as herein indicated, and for costs.

SCOTT, SMITH, PAGE and DAVIS, JJ., concurred.

Judgment reversed, with costs, and complaint dismissed, and judgment ordered for the defendants on their counterclaim as stated in opinion, with costs. Order to be settled on notice.