[Civ. No. 22274. Second Dist., Div. Two. Dec. 20, 1957.]

EDMOND DU PONT et al., Respondents, v. ISADORE NEIMAN, Appellant.

Fitzpatrick & Whyte and John Whyte for Appellant.

Macdonald & Halsted and Robert H. Edwards for Respondents.

FOX, Acting P. J.—Plaintiffs are brokers for customers in the purchase of securities and commodities and as such are members of the principal exchanges, including the Chicago Board of Trade and the New York Cotton Exchange.

On March 28, 1952, defendant opened with plaintiffs Account Number 6467, which was a commodity margin account trading in commodities for future delivery. The commodities traded in the account were soy beans, cotton, wool tops and grease wool. The transactions in beans were executed on the Chicago Board of Trade; the others on the New York Cotton Exchange. On June 17, 1952, defendant opened another margin account (No. 6458) in the name of his wife in which the only commodity traded was soy beans. There was also an Account Number 6470 in the name of defendant through which he dealt in securities on a cash basis.

Early in June, 1952, defendant began falling behind in response to the margin calls made upon him by plaintiffs with respect to Account Number 6467. Under the rules of the various exchanges the broker makes a margin call when the customer's equity falls below the required margin. The customer must then deposit additional funds to bring his account up to the required margin, usually within 24 hours. In response to the various margin calls, defendant gave plaintiffs his personal checks drawn on a Michigan bank, but in numerous instances the amount of the check was substantially less than the margin call.[1] It should be noted, however, that the margin calls were not made every day since the equity in defendant's account was sufficient on some days to cover margin requirements. On June 26, 1952, plaintiffs were informed by their bank that several checks issued by defend-

---

[1]For example:

| | | | | | |
|---|---|---|---|---|---|
| June 7 — Margin call — $10,600 | June 9 — | Deposit | — $ 4,500 |
| June 10 — " " — 32,000 | June 11 — | " | — 10,500 |
| June 11 — " " — 28,400 | June 12 — | " | — 10,000 |
| June 12 — " " — 21,000 | June 13 — | " | — 10,000 |
| June 16 — " " — 9,000 | June 17 — | " | — 7,000 |
| June 19 — " " — 57,500 | June 20 — | " | — 10,000 |
| June 21 — " " — 58,750 | June 23 — | " | — 48,750* |

*Note: This was one of the checks which was uncollectible.

ant in response to margin calls in both commodity accounts were not honored because of insufficient funds. The next day plaintiffs informed defendant that all his accounts would be closed immediately. Liquidation was commenced on that day and completed on July 1st. Bad checks in the total amount of $68,750 (plus $2.87 in service charges) were debited to Account Number 6467, leaving a balance in defendant's favor of $7,794.34. However, after liquidation of the other two accounts and debiting to account Number 6458 a bad check in the amount of $23,750 there was a debit balance of $14,072.80 in these two accounts. The final result, therefore, was a deficit balance of $6,278.46, the amount which plaintiffs sought to recover in this action, and for which amount the lower court gave judgment. It is from this judgment that defendant has appealed.

The trial court found that defendant's three accounts were opened pursuant to the Customer's Margin Agreement executed by defendant and that each account was managed exclusively for his benefit and as his sole property. It further found that certain of the checks given by defendant in response to margin calls by plaintiffs had proved to be uncollectible and that on June 27, 1952, plaintiffs informed defendant that all three accounts must be closed at once. It also found all the allegations of defendant's several affirmative defenses and of his counterclaim to be untrue.

Defendant's basic contention on this appeal is that the evidence establishes as a matter of law that the transactions which plaintiffs executed for him on the various commodity exchanges were illegal and that he is therefore entitled to disaffirm them. He points out that the customer's margin agreement provided that all transactions were "subject to the rules and regulations of the Exchange or market where executed," and that the rules of the Chicago Board of Trade and the New York Cotton Exchange prohibit the extension of credit on margin requirements by a broker.[2] He then argues that plaintiffs, by accepting checks in lesser amounts than the

[2]Rule 210 of the Chicago Board of Trade provides, in part, as follows:

"210. Margins.—No member may accept or carry an account for a customer, whether a member or non-member, without proper and adequate margin. The Board, by regulation, shall fix minimum margin requirements."

Paragraph 7 of Regulation 1822 of the Chicago Board of Trade provides:

"7. No member shall extend any credit or give any rebate or

margin calls which were made, were extending credit to him in violation of the rules of the commodity exchanges on which he dealt. Defendant thus concludes that plaintiffs' acts rendered the transactions illegal, thereby entitling him to disaffirm those transactions and to recover the value of his equity prior thereto.

■ We must first examine the rules of the exchange[3] in order to determine whether there have been violations thereof. Rule 209 of the Chicago Board of Trade, which relates to the duty of the broker to require initial and subsequent margin deposits, provides in part: "The failure of the customer to make such deposit within such time, shall entitle, but shall not oblige, the commodity merchant to close out the trades of the defaulting customer." While this rule gave plaintiffs the right to close out defendant's account when he failed to meet margin calls in full, it did not require such action. (See *Jacobs* v. *Hyman*, 286 F. 346, 351.) The discretionary character of this provision clearly indicates that the failure of plaintiffs immediately to close out defendant's accounts when he began to pay less than plaintiffs demanded was not a violation of the rule. And it could not render subsequent transactions either invalid or illegal.

■ Another pertinent provision is found in paragraph 14 of Regulation 1822 of the Chicago Board of Trade. It provides in part: "No member may carry for a customer hedging or spreading transactions in grain when the customer's account, figured to the market, would result in a deficit . . . The failure of a member to close the customer's account before it results in such deficit or under margined

---

gratuity of any kind to any person for the purpose of circumventing or evading minimum margin requirements."

Defendant further relies on the following testimony of Daniel Hayes, plaintiffs' commodity supervisor in the New York office:

"Q. Those margin calls are payable in full, are they not? A. That is correct.

"Q. And they are payable in cash? A. That is correct.

"Q. As a matter of fact, it is a violation of the rules and regulations of the Chicago Board of Trade to permit credit to be given in regard to margin calls? A. No credit is to be extended on margin calls.

"Q. And that is a violation of the rules and regulations of the Chicago Board of Trade? A. That is correct.

"Q. It is also a violation of the rules and regulations of the New York Cotton Exchange? A. That is correct."

[3]Although some of the transactions here involved were executed on the New York Cotton Exchange, the rules and regulations of that exchange were not put in evidence. Therefore, only the rules and regulations of the Chicago Board of Trade will be considered.

condition shall not relieve the customer of any liability to the member . . ." It is clear from this language that the failure of the broker promptly to close the account of a delinquent customer does not affect the latter's liability nor the former's right to recover any deficiency on the account. Defendant argues that the above provision applies only to hedging or spreading transactions and that there is no evidence that such transactions were involved in this case. Thus, he concludes that this rule has no applicability to the facts before us. However, a careful examination of the evidence discloses that defendant engaged in several spreading transactions during the period in question herein. ▮ "Spreading" is acquiring a contract to purchase a particular commodity for delivery in one month, while simultaneously acquiring a contract to sell such commodity for delivery in some other month.[4] Applying this definition, it appears that more than half of defendant's trades during the month of June 1952 involved spreading transactions. For example, on June 4 he had plaintiffs execute for him contracts to *purchase* a total of 50,000 bushels of soy beans for January delivery; on the same day he directed plaintiffs to negotiate for him contracts to *sell* a total of 50,000 bushels of soy beans for July delivery. Defendant had thus "spread" his position as to 50,000 bushels of soy beans. Similar spreading transactions took place on June 5, 18, 20 and 25. While not all of the transactions which defendant had plaintiffs execute for him involved spreading, the applicability of the above provision to the present case is clear. ▮ The effect of the provision is to permit different margin requirements upon hedging and spreading transactions (see Regulation 1822-A). But in so doing the provision makes clear that such different requirements in these transactions shall not otherwise affect the rights and duties of the broker and customer. It may therefore be inferred that the failure to close out a customer's account as to transactions *not* involving hedging or spreading likewise does not relieve the customer of any liability to the broker. By the terms of the above provision defendant is liable on all spreading transactions. And by its implications he is likewise liable on all other transactions here involved.

▮ It does not appear that plaintiffs' action in this case constituted an extension of credit "for the purpose of circum-

[4]See Baer & Saxon, Commodity Exchanges and Futures Trading, p. 173; Merrill Lynch, Pierce, Fenner & Beane, How to Buy and Sell Commodities, p. 45.

venting or evading minimum margin requirements" under the regulation upon which defendant so strenuously relies (i.e., Paragraph 7 of Reg. 1822). The evidence plainly shows that plaintiffs never intended to circumvent margin requirements in their dealings with defendant. Rather, the defendant is attempting to benefit from his own wrong. Plaintiffs never failed to call for additional margin when it was needed. Their only remissness was their indulgence of defendant by waiting several days to close out defendant's account after he started falling behind in payment of the margin deposits which they sought. The trial court found that "on June 26, 1952, after the exchanges had closed that day, plaintiffs were informed by California Bank that several of [the] checks executed and delivered to plaintiffs by defendant . . . would not be paid" because of insufficient funds. Plaintiffs immediately notified defendant that his accounts would be closed, and on the next business day almost all of defendant's outstanding contracts were disposed of. The fact that defendant drew all of his checks on a Michigan bank helps to explain their delay in being returned to plaintiffs. The reasonable inferences from the foregoing facts adequately support the trial court's finding that plaintiffs were not extending credit to the defendant for the purpose of circumventing or evading minimum margin requirements.

It is clear that any loss suffered by defendant was not the result of plaintiffs' accepting his checks in amounts less than the margin calls. Such loss was solely due to defendant's passing bad checks. If all those checks had been collectible, defendant would have had a credit of more than $85,000 upon the liquidation of his accounts.

Assuming, *arguendo,* that the transactions in question were in violation of the rules and regulations of the commodity exchanges on which they were executed, defendant nevertheless has failed to establish his alleged right to disaffirm. Defendant concedes his inability to discover a California decision in support of his theory but insists that it is supported by *Cohen* v. *Rothschild,* 182 App.Div. 408 [169 N.Y.S. 659], and argues that since the customer's margin agreement provides that the enforcement thereof should be governed by the laws of New York, the Cohen case is controlling. However, we have concluded that neither New York nor California law supports defendant's position. The Cohen case, as hereafter shown, is not in point.

No contention is made by defendant that plaintiffs violated

any exchange rules in the *execution* of the orders of purchase and sale given to them by him. The only complaint made by defendant is that plaintiffs "illegally" granted him credit on the margin calls. But defendant cites no case in which the granting of credit by a broker permits the customer to disaffirm transactions made after granting and acceptance of such credit.

In the Cohen case a customer brought an action against a firm of cotton exchange brokers. The complaint contained two counts. The first was to recover money on the ground that it was received without consideration and pursuant to a scheme by which defendants intended to defraud plaintiff by claiming that they had made contracts for him on the cotton exchange when they in fact had made none, or when those they had made had been offset and settled by alleged contracts of a similar nature made in their own behalf. The second count was to recover money on the ground that it was paid without the defendants having purchased or sold cotton to be delivered by the plaintiff, and on a wager or contingency by which both parties intended to bet upon the course of quotations of cotton prices on the New York Cotton Exchange in violation of the statutory law of New York. The trial court, in accordance with the report of a referee, gave judgment for plaintiff in the amount of $7,735, the amount paid by plaintiff to the defendants from November 1911 to May 1912.

The reviewing court held that no fraud was shown on the first count and it should have been dismissed. The court further found that since the second count had been properly dismissed by the referee, the entire complaint should have been dismissed. The referee had disallowed certain counterclaims for balances claimed by defendant brokers, and the remaining question was whether five orders executed by the brokers were in accordance with the rules of the exchange. Two of these orders were "cross-sales"[5] and two were "switch-

---

[5]Speaking of the cross-sales, the court said (p. 664 [169 N.Y.S.]):

"Two of the five were orders for the purchase of contracts for the future delivery of cotton, one on the 9th and the other on the 26th of April, 1912. Those orders were executed by crossing them with orders received by the floor member of the defendants from other customers at the same time to purchase like contracts on the same terms, which was in accord with the custom followed by brokers on the cotton exchange, but was found by the referee not to have been authorized by the rules of the exchange. We agree with the referee with respect to that finding, for crossing the orders involved resorting to the making of fictitious records in an effort to conform to the rules of the

trades.''[6] The court held that the cross-sales were fictitious and the switch-trades were unauthorized and, since these transactions were not provided for by the rules of the exchange, the plaintiff was entitled to disaffirm them. The judgment was reversed and the complaint dismissed, defendants being given judgment on their counterclaim for the balance owing on plaintiff's general account after modifying the same by eliminating the cross-sales and switch-trades.

In the instant case, defendant makes no claim that plaintiffs did not follow his orders in the execution of his purchases and sales, nor does he charge that plaintiffs made any fictitious transactions or violated any exchange rules in the *execution* of his orders. His only claim is that plaintiffs violated exchange rules in granting him credit *after the transactions had been made in accordance with his orders.* In effect, his argument is that the alleged ''illegality'' in granting him credit vitiated the transactions made prior to the granting of credit. *Cohen* v. *Rothschild, supra,* is not authority for such an argument, nor have we found any decision that is.

█ We know of no rule of law in this state which would permit a wrongdoer to disaffirm a loss brought on by his own iniquity unless there be a violation of law involved. Nor is

exchange, which required that there should be two brokers to every purchase or sale, one on either side of the trade, and the signing of sales and purchasing slips by them, respectively. The floor broker holding the order from different customers to buy and sell on the same terms would cry out the transaction across the ring on the exchange, and make the sale and purchase himself at the price shown by the last sale on the exchange. That is called a cross-sale or trade. . . .''

[6]In respect to the switch-trades, the court said (p. 665 [169 N.Y.S.]):

''Two of the other trades, which the referee found to have been illegally executed, were the purchase of 100 bales of October cotton on the 1st day of May and the sale of 100 bales of July cotton on the 4th of May, 1912. These were also specific, definite orders, and they were executed by trades known as switches, which are resorted to when the broker cannot execute the order as given, or cannot in his judgment execute it advantageously to the customer, but is willing to give the customer the benefit of the order as if executed as directed, or most advantageously to him. The broker, being unable or deeming it inadvisable to execute the order for the particular month specified by the customer, executes it for another month, and reports it executed as ordered. In such instances the broker assumes the risk of being able later on to effect a sale or purchase of cotton, as the case may be, for the particular period and at the price desired by the customer, or which he would ordinarily receive in a normal market, and of thus switching the trade. Those transactions likewise were customarily indulged in on the exchange, but were not provided for by the rules.''

there any law in this state which makes the violation of a rule of an "exchange" in granting credit to a broker's customer an "illegal" transaction. It is neither *malum prohibitum* nor *malum in se*. It is manifest that the rules of a trading exchange cannot have the effect of a statutory enactment, and therefore cannot of their own force inject illegality into a transaction.

It is unnecessary to discuss other incidental points raised by counsel.

The judgment is affirmed.

Ashburn, J., and Richards, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.